The appellee, Laletia Ramon Hale, was indicted for trafficking in cocaine, a violation of § 13A-12-231(2), Ala. Code 1975. He filed a motion to suppress evidence law enforcement officers seized from his vehicle. After conducting a hearing, the trial court granted the appellee's motion to suppress and, on the State's motion, dismissed the indictment against him. This appeal followed.
During the suppression hearing, Trooper Jason Burch of the Alabama Department of Public Safety testified that, on September 25, 2006, he observed the appellee driving too closely behind another vehicle on Interstate 85 and conducted a traffic stop; that he approached the appellee's vehicle, talked to him about the traffic violation, and asked to see his driver's license; that the appellee appeared unusually nervous; and that he told the appellee he was going to give him a warning citation and returned to his vehicle. He also testified that, when he returned to his vehicle, he called Trooper Mike Harris for assistance; that Harris arrived a few minutes later; that he called the appellee to the back of his vehicle; and that he gave the appellee the citation, the appellee signed it, and he returned the appellee's driver's license. Finally, Burch testified that, at that time, he asked the appellee if he had any guns or drugs in his vehicle and if he would consent to a search of his vehicle; that the appellee told him he could search his vehicle, but he did not see the need for it; that, because he did not believe the appellee had fully consented to a search, he decided to have a dog sniff the appellee's vehicle; that the dog gave a positive signal for the presence of drugs; and that he searched the appellee's vehicle and found an off-white powder that appeared to be cocaine.
The State argues that the trial court erroneously granted the appellee's motion to suppress the evidence law enforcement officers seized from his vehicle. Specifically, it contends that the appellee gave Burch consent to search his vehicle and that the appellee was not in custody at the time Burch requested consent to search his vehicle. In State v.Hill, 690 So.2d 1201, 1203-04 (Ala. 1996), the supreme court stated the following with regard to standards of review to be applied when reviewing a trial court's ruling on a motion to suppress:
 "`Where evidence is presented to the trial court ore tenus in a nonjury case, a presumption of correctness exists as to the court's conclusions on issues of fact; its determination will not be disturbed unless clearly erroneous, without supporting evidence, manifestly unjust, or against the great weight of the evidence. Odom v. Hull, 658 So.2d 442 (Ala. 1995). However, when the trial court improperly applies the law to the facts, no presumption of correctness exists as to the court's judgment. Ex parte Board of Zoning Adjustment of the City of Mobile, 636 So.2d 415 (Ala. 1994).'
"[Ex parte Agee,] 669 So.2d [102,] 104 [(Ala. 1995)]."
In granting the motion to suppress, the trial court based its decision on our holding in Peters v. State,859 So.2d 451 (Ala.Crim.App. 2003). In Peters, the following occurred:
 "State Trooper Thad Chandler testified that on May 10, 2001, he and Deputy Brock were patrolling Interstate 20, when he noticed a Chevrolet Silverado truck with a Texas license plate following another vehicle too closely. He turned on his emergency lights and stopped the truck. Trooper Chandler approached the truck and asked Peters *Page 452 
to exit the truck and produce his driver's license. Trooper Chandler explained to Peters the reason for the stop. According to Trooper Chandler, Peters seemed agitated. Trooper Chandler testified that he had received training in looking for signs of human behavior that indicate criminal activity. Trooper Chandler testified that when he made the traffic stop, nothing initially indicated criminal activity. He became suspicious when he told Peters he was going to receive only a warning — not a traffic ticket — because Peters still seemed agitated.
 "Trooper Chandler had Peters sit in his patrol car while he wrote out the warning ticket. Trooper Chandler testified that in an effort to reduce the tension, he asked Peters where he was traveling. Peters told him that he was going to Myrtle Beach, South Carolina. At this time, Deputy Brock was speaking with the passenger in the truck. Trooper Chandler said to Peters, `I see you have your wife with you today.' (R. 11.) Trooper Chandler said that his comment seemed to agitate Peters more. Peters said, `No, it's not my wife. It's a friend of mine.' (R. 11.) Peters told Trooper Chandler that his wife had remained in Texas because she was having surgery or had had surgery. Trooper Chandler testified that at this time he concluded the traffic stop. Peters went to get out of the police vehicle. Trooper Chandler asked Peters if he would please sign the warning and receive his copy. Trooper Chandler testified that Peters then took the form and signed it abruptly. After signing the warning, Peters again went to get out of the vehicle. Trooper Chandler said, `Mr. Peters, if you will, please allow me to give you your copy.' (R. 12.) Trooper Chandler testified that in his experience, a traffic offender's trying to exit the patrol car before the citation is complete is a key indicator of criminal activity. Trooper Chandler gave Peters his copy of the warning. Peters got out of the vehicle and began walking to his truck.
 "At this point, Trooper Chandler got out of the vehicle and said, `Mr. Peters, may I talk to you a moment more?' (R. 12.) Trooper Chandler testified that Peters sharply said, `What? Yes.' (R. 12.) Trooper Chandler asked Peters if there was anything illegal in his truck. Peters said, `I travel up and down this interstate one hundred — I have done this one hundred times. I have been stopped by law enforcement and no one has ever asked me to search my truck.' (R. 12.) Trooper Chandler told Peters that he did not ask him if he could search his truck but only asked him if he had anything illegal. Peters told him that he did not. Trooper Chandler asked him if he had any marijuana in his vehicle. Trooper Chandler testified that Peters's response alarmed him. He said Peters looked down to the ground and dropped his chin to his chest, which Trooper Chandler believed to be clues that Peters was being deceptive. Peters said, `No. No. No.' (R. 33.) Trooper Chandler then asked Peters if he could search the vehicle. Peters refused consent and stated that he did not have time. Trooper Chandler told him that that was fine, that he was free to leave, but that he was detaining the truck so the canine unit could make a sweep of the vehicle.
 "The canine unit arrived a few minutes later and made a sweep of the vehicle. The canine alerted to the tailgate of the truck. Trooper Chandler directed Peters to open the camper shell on the truck. Peters said, `That dog's lying.' (R. 17.) He continued, `I've seen those cop shows. Tall can make those dogs do what you want them to do.' (R.17.) *Page 453 
Peters said he did not have a key to open the top. A second canine unit arrived and also alerted to the tailgate. An officer then opened the camper shell. Trooper Chandler saw two large, duffle bags. He placed his hand on the bags and felt a block-like substance in each one. Based on his experience, Trooper Chandler believed that the blocks were illegal drugs. He opened the bags and saw blocks of vacuum-sealed green leafy plant material, later determined to be marijuana. At some point, Deputy Brock, who had spoken with the passenger, told Trooper Chandler that the passenger said they were traveling to Augusta, Georgia. However, Trooper Chandler said that this occurred after the traffic citation portion of the stop had been concluded. The only other testimony at the suppression hearing was that of Wesley Clark, Jr. Clark established the chain of custody of the marijuana.
"Peters argues that the marijuana should have been suppressed because, he argues, Trooper Chandler did not have reasonable suspicion for the canine unit to search the truck. Peters argues that the scope of the stop should have been limited to what was necessary to issue the warning citation for the traffic violation. This Court has stated:
 "`Once the traffic offender signs the UTTC [Uniform Traffic Ticket and Citation], the arresting officer is to "forthwith release him from custody." § 32-1-4(a)[, Ala. Code 1975]. The officer may further detain the driver only if he has probable cause to arrest the driver for some other non-traffic offense, see Hawkins v. State, 585 So.2d 154
(Ala. 1991), or has a reasonable suspicion of the driver's involvement in some other criminal activity justifying further detention for investigatory purposes under Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)], see United States v. Tapia, 912 F.2d 1367 (11th Cir. 1990).
 "`"Reasonable suspicion is a less demanding standard than probable cause." Alabama v. White, 496 U.S. 325, 330, 110 S.Ct. 2412, 2416, 110 L.Ed.2d 301
(1990). However, reasonable suspicion exists only if the officer has "specific, particularized, and articulable reasons indicating that the person [stopped] may be involved in criminal activity," Hickman v. State, 548 So.2d 1077, 1080
(Ala.Cr.App. 1989). "To determine whether reasonable suspicion existed for a particular stop, the totality of the circumstances, as known to the officer at the inception of the stop, [or, in this case, at the time of the continued detention,] must be considered." Arnold v. State, 601 So.2d 145, 149 (Ala.Cr.App. 1992) (emphasis added [in Washington]). Accord Lamar v. State, 578 So.2d 1382, 1385 (Ala.Cr.App.), cert. denied, 596 So.2d 659 (1991).'
"State v. Washington, 623 So.2d 392, 395-96
(Ala.Crim.App. 1993).
"Trooper Chandler's testimony at the suppression hearing clearly established that he had probable cause to stop Peters and effect a noncustodial traffic arrest for the offense of following a vehicle too closely. Trooper Chandler testified that Peters appeared to answer his questions truthfully and that he signed the Uniform Traffic Ticket and Citation ('UTTC'). The question is whether Trooper Chandler had the necessary reasonable suspicion to continue to detain Peters after Peters had signed the UTTC.
"It appears that the only reasons Trooper Chandler gave for detaining Peters were that Peters acted nervous, *Page 454 
 appeared agitated, and tried to exit the patrol car before signing the warning citation or receiving his copy. `"[T]here is no constitutional requirement of reasonable suspicion as a prerequisite for seeking consent to search."' State v. Washington, 623 So.2d at 397, quoting State v. Abreu, 257 N.J.Super. 549, 555, 608 A.2d 986, 989 (1992). As was the case in Washington, it is clear from Trooper Chandler's questions concerning any illegal activity that Trooper Chandler went beyond merely asking for consent to search and initiated, instead, an investigative detention."
859 So.2d at 452-54.
However, the facts of this case are more similar to those inTillman v. State, 647 So.2d 7 (Ala.Crim.App. 1994). InTillman, the following occurred:
 "Tillman argues that her detention by law enforcement officers and the search of her purse was an illegal search and seizure, in violation of the Fourth Amendment. Specifically, Tillman argues, the police did not have sufficient `reasonably articulable' suspicion to detain her and to search her vehicle, nor did they have the right to search her nor did they have the right to search her purse incident to the search of the vehicle.
 "Tillman's argument assumes that she was in fact being detained when the law enforcement officer asked whether he could search her van. She concedes that the police had a legitimate purpose for stopping her, i.e., that she was driving with an expired Mississippi license plate on her van. However, she maintains that the two law enforcement officers did not have probable cause or reasonable suspicion to investigate any criminal activity beyond the status of her license plate and driver's license.
 ". . . .
 "In this case, the officer did release Tillman from custody as soon as she signed the UTTC. At that time, he handed her a copy of the UTTC, as well as the driver's license or identification she had given him. A reasonable person would believe that at that point, he was free to leave. According to both officers' testimony, Stewart then asked Tillman whether she had any drugs or weapons and when she said no, he asked if he could search the van. Tillman consented to the search of the vehicle. A mere request on the part of a law enforcement officer to search a vehicle after pulling the vehicle over for a legitimate purpose does not amount to a detention of the person of whom the request is made, assuming the officer has disposed of the legitimate purpose for which the vehicle was stopped. In addition, consent to the search waives any right to privacy afforded by the Fourth Amendment. Ball v. State, 592 So.2d 1071
(Ala.Crim.App. 1991).
 "In Washington, this court said there is no constitutional requirement of reasonable suspicion as a prerequisite for seeking consent to search. State v. Washington, 623 So.2d at 397
(quoting State v. Abreu, 257 N.J.Super. 549, 608 A.2d 986, 989, (1992) (citing 3 W. LaFave, Search and Seizure § 8.1 at 32 n. 5.1 (Supp. 1992))[)]. We do not agree with the appellant's assertion that our decision in Washington
implies that a police officer needs a factual basis, in addition to the legitimate purpose for which the vehicle was stopped, to request the driver's permission to search the vehicle for drugs. Consent searches play an important role in police investigations and should not be limited or restricted to the same extent as investigatory stops and searches under Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, *Page 455 20 L.Ed.2d 889 (1968). `If consent is given, evidence may thereby be uncovered in a situation where there was no other lawful basis for making the search.' 3 LaFave, Search and Seizure § 8.1 at 148 (1987).
 "`"Consent searches were deemed to be a `wholly legitimate aspect of effective police activity,' for when there is no probable cause they `may be the only means of obtaining important and reliable evidence,' and even where there is probable cause a search by consent `may result in considerably less inconvenience for the subject of the search.'
 "`". . . .
 "`"Consent searches are part of the standard investigatory techniques of law enforcement agencies. They normally occur on the highway, or in a person's home or office, and under informal and unstructured conditions. The circumstances that prompt the initial request to search may develop quickly or be a logical extension of investigative police questioning. The police may seek to investigate further suspicious circumstances or to follow up leads developed in questioning persons at the scene of a crime."`
 "Ball v. State, 592 So.2d 1071, 1073
(Ala.Crim.App. 1991) (quoting 3 LaFave, Search and Seizure § 8.1(a) (1987)).
"Therefore, we hold that Tillman was not being detained after the police officer returned her identification and the signed UTTC. Tillman's consent to the officer's request to search her vehicle after she had been stopped for a legitimate purpose resulted in a legal search of the van, and officials did not have to have reasonable suspicion that Tillman was carrying drugs, weapons, or any other contraband to conduct the search."
647 So.2d at 9-10.
As in Tillman, in this case, the appellee had signed the warning citation and Burch had returned his driver's license to him at the time Burch requested his consent to search. Therefore, the appellee had been released from custody at that time. Also, unlike Peters, this was not a situation where Burch questioned the appellee in a manner that went beyond a mere request for consent to search and constituted an investigative detention. Therefore, the appellee was not being detained at the time Burch requested consent to search his vehicle. Finally, the State presented evidence that the appellee told Burch he could search the vehicle before Harris walked the dog around the vehicle. Therefore, this was not a situation where the appellee was unlawfully detained against his will after the traffic stop was completed. For these reasons, the facts of this case are more akin toTillman than Peters. Based on the reasoning in Tillman, we conclude that the trial court erroneously granted the appellee's motion to suppress. Accordingly, we reverse the trial court's judgment and remand this case for proceedings that are consistent with this opinion.
REVERSED AND REMANDED.
McMILLAN, SHAW, WISE, and WELCH, JJ., concur.